FILED

UNITED STATES DISTRICT COURT 13 APR 29 PM 4: 39
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION CLERK, US. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA

RMS TITANIC, INC. and
PREMIER EXHIBITIONS, INC.,

    Plaintiffs,

v.                                                CASE NO. 3:13-CV-463-J-20 TEM

KINGSMEN CREATIVES, LTD,
KINGSMEN EXHIBITS, PTE, LTD,

    Defendants.

_____

## COMPLAINT AND DEMAND FOR JURY TRIAL

    Plaintiffs, RMS Titanic, Inc. ("RMST") and Premier Exhibitions, Inc. ("Premier"

and, together with RMST, the "Company" or "Plaintiffs"), sue Kingsmen Creatives, LTD.

and Kingsmen Exhibits PTE, LTD. (collectively referred to as "Defendants"), and allege:

### PARTIES, JURISDICTION AND VENUE

    1.    Plaintiff RMST is a corporation organized under the laws of the State of

Florida and having its principal place of business at 3340 Peachtree Road NE, #900,

Atlanta, Georgia 30326.  RMST is a wholly-owned subsidiary of Plaintiff Premier.

    2.    Plaintiff Premier is a corporation organized under the laws of the State of

Florida and having its principal place of business at 3340 Peachtree Road NE, #900,

Atlanta, Georgia 30326.

    3.    Defendant Kingsmen Creatives, Ltd. ("KCL") is a corporation organized

under the laws of Singapore with its principal place of business at 3 Changi South Lane,

Singapore 486118.  KCL is a public corporation traded on the Singapore Exchange. KCL

maintains at least eighteen offices around the world, and conducts business on every continent.

4.      Defendant Kingsmen Exhibits Pte. Ltd ("KEPL") is a wholly-owned subsidiary of KCL with its principal place of business at 3 Changi South Lane, Singapore 486118. KEPL regularly transacts business in the United States, including in Jacksonville, Duval County, Florida.

5.      Defendants KCL and KEPL are in the business of designing, producing and building experiential and immersive retail and corporate interiors, exhibitions, thematic events, and museums.

6.      This Court has subject matter jurisdiction under 15 U.S.C. § 1051 *et seq.* (the "Lanham Act"), 15 U.S.C. § 1125, and pursuant to 28 U.S.C. §§ 1331, 1332 and 1367.

7.      The Court has personal jurisdiction over the Defendants under Fla. Stat. § 48.193 as they operated, conducted, engaged in and carried on their businesses in this state and district, because the Defendants committed a tortious act in this state and district, and because the Defendants caused injury to the property of Plaintiffs within this state and district arising out of acts of Defendants outside the state when at or about the time of injury the Defendants were engaged in solicitation or service activities within this state.

8.      Venue is proper in this judicial district as a substantial part of the events giving rise to the claim occurred in this district.

## FACTUAL BACKGROUND

### "Titanic ... The Artifact Exhibition"

9.      RMST presents museum quality exhibitions of artifacts recovered from the wreck site of the RMS Titanic (the "Artifacts"). Most of the Artifacts were recovered from the wreck site during the eight (8) research and recovery expeditions conducted by RMST, in its capacity as salvor-in-possession, since the ship's discovery in 1985.

10.     As part of the Company's business, the Company partners with various venues to present exhibitions of the Artifacts, together with supporting materials and exhibitry owned or controlled by RMST, known as "Titanic ... The Artifact Exhibition" (the "RMST Exhibition"). The Company specially tailors each RMST Exhibition to fit the venue in which it is displayed; however, the overall design of each exhibition is similar, if not the same.

11.     The RMST Exhibition has been specifically created and designed by the Company to take visitors on a chronological journey through the life of the RMS Titanic, from the building of the ship, to life on board during its voyage to America, and finally to the ruins on the ocean floor. The RMST Exhibition has been designed by the Company with a focus on the compelling human stories as best told through authentic artifacts and extensive room re-creations.

12.     For example, at the beginning of the RMST Exhibition, each visitor is provided a passenger ticket with a name and personal information regarding one of the passengers of the Titanic. The visitor carries this ticket with them throughout the RMST

Exhibition to the end, where he or she can search a list of names of those who died upon the Titanic's sinking, to see the fate of their passenger.

13.   Throughout the RMST Exhibition, the visitors view specially placed Artifacts, as well as some copyrighted photographs and videos of the Titanic, the Titanic wreckage, and notable passengers.   Informative narratives and quotations, written or chosen and edited by the Company, accompany each photograph.

14.   The RMST Exhibition allows the visitors to walk through re-creations of several of Titanic's various cabins, hallways, and other rooms, and to experience other unique Titanic-related settings, such as standing on a virtual ocean floor amidst the wreckage and debris field. Several room re-creations were designed by the Company to closely track historical photographs of rooms aboard the Titanic, such as the grand staircase; the Company took creative license to design, develop, and build other room re-creations and settings, such as the first class hallway, without historical reference.

15.   Regardless of whether or not each specific room re-creation was designed with or without historical reference, the quality and appearance of each room is novel and unique, and contains an original expression of ideas fixed in a tangible medium subject to legal protection under the Copyright Act.

16.   The RMST Exhibition, when viewed as a whole, and as a collection of copyrightable works, contains an original expression of ideas fixed in a tangible medium subject to legal protection under the Copyright Act.

- 4 -

17. Additionally, the RMST Exhibition includes several works that are so novel, unique and distinct as to have become signature works which are readily recognized or associated with the RMST Exhibition.

18. Certain publications incorporating photographs of the RMST Exhibition and individual re-created rooms and/or signature works have been created, copied, and distributed and represent derivative works subject to copyright protection under the Copyright Act, and certain of RMST's materials and photographs have been registered for further copyright protection.

19. RMST is the rightful and exclusive owner of all intellectual property rights associated with the RMST Exhibition.

## The RMST Exhibition in Singapore

20. On June 13, 2011, the Company entered into an agreement to present the RMST Exhibition in Singapore (the "Singapore Exhibition Agreement").

21. Thomas Zaller negotiated the Singapore Exhibition Agreement with the Company on behalf of the promoter of the Singapore Exhibition. Zaller is a former employee of RMST and Premier, and is extremely familiar with the quality and novel characteristics of the RMST Exhibition. At the time he negotiated the Singapore Exhibition Agreement, Zaller was a consultant to the promoter and held himself out to the public as the Museum Director for the promoter, in charge of the venue where the Singapore Exhibition would be staged.

22.     Mr. Zaller and the promoter of the Singapore Exhibition hired the Defendants to design and build a room for the RMST Exhibition. In that capacity, the Defendants worked closely with Mr. Zaller, the Singapore promoter and the Plaintiffs in the development of the RMST Exhibition. The Defendants worked and became very familiar with the Plaintiffs' architectural design files and the look and feel of the RMST Exhibition, including the various proprietary components of the RMST Exhibition.

23.     During the negotiations and during the setup of the RMST Exhibition in Singapore, Zaller repeatedly and over a period of many months requested the Company provide him confidential and proprietary information, ostensibly on behalf of the promoter, which information the Company ordinarily does not provide to its promoters or third-parties.

24.     For example, on November 22, 2010, in the nascent stages of the negotiations, before a term sheet was agreed upon and long before it was even clear that the parties would execute the Singapore Exhibition Agreement, Zaller asked for, "the floor plan (in CAD with elevations/ceiling heights) [and] photos." His request was denied. Zaller made similar requests over the next six (6) months; each was denied by the Company. On June 16, 2011, immediately after the Singapore Exhibition Agreement was signed, Zaller asked Premier to immediately ship the Company's most sensitive, proprietary information. Specifically, he requested "a CAD for the last 3 or 4 cities that this exhibition has been in," an extraordinary request which RMST would normally never consider. Premier representatives initially denied Zaller's request, explaining that such information is "proprietary" information which Premier does "not share." Zaller persisted

- 6 -

in requesting the Computer-Aided Design ("CAD") and other key, highly restricted tangible personal property and intellectual property materials, which RMST ordinarily does not provide to third-parties.

25.     Zaller represented – falsely – that such tangible personal property and intellectual property and materials were necessary for staging the RMST exhibition in Singapore, and would be used only for its staging.

26.     Because the Company had serious concerns about providing Zaller access to its key intellectual property, the Company required the promoter to make certain representations and warranties in the Singapore Exhibition Agreement for the protection of this tangible personal property and intellectual property, and to abstain from engaging in competing exhibitions for a period of three (3) years.  The Company would not provide their property without the promoter's representations and warranties that it would protect the Company's property and prevent it from being used elsewhere, including in any competing Titanic exhibitions.

27.     The Company likewise included provisions in the Singapore Exhibition Agreement to further protect the Company's confidential and proprietary information. For example, the promoter represented that it and its agents would not "compromise or make ownership claims" to the Company's intellectual property. The promoter further agreed that all information and other data developed in conjunction with the Singapore Exhibition Agreement would be considered "trade secrets" of the Company or would otherwise be "proprietary and confidential to the respective parties, and [would] not be disclosed, disseminated or otherwise revealed, in whole or in part, by either party or their employees,

- 7 -

agents or contractors" to "any-third party." These confidentiality provisions of the Singapore Exhibition Agreement survived the termination of the agreement.

28.     As set forth above, the Company takes extensive measures to protect its intellectual property and trade secrets; it was only after the above confidentiality provisions and representations and warranties were agreed upon and specifically included in the Singapore Exhibition Agreement that, based upon Zaller's representations they were needed for the Singapore Exhibition, RMST finally provided Zaller and Defendants access to certain key tangible personal property and intellectual property.  The property was provided by electronic mail, through the use of a File Transfer Protocal or "FTP" site utilizing the Company's Atlanta, Georgia based network, via a web based file-transfer service called "yousendit" and on a compact disc (CD) and flash drive shipped via FedEx from Atlanta, Georgia to Singapore. The information contained in these deliveries contained essential, confidential data and information needed to build a Titanic exhibition. This included the Company's CAD files, graphic and text files, photographs and videos, floor plans, narratives, designs for its signature works and other intellectual property relating to the RMST Exhibition. The signatories to the Exhibition Agreement agreed such property and information were to be used strictly for staging of the Singapore Exhibition.

### The Zaller/Kingsmen Exhibition

29.     During the RMST Exhibition in Singapore, Mr. Zaller and his company, Imagine Exhibitions, PTE, Ltd. (hereinafter collectively, "Zaller"), entered into a contract with the Defendants under which the parties agreed to jointly own and produce their very own Titanic exhibition (the "Zaller/Kingsmen Exhibition"). The Zaller/Kingsmen

Exhibition is a striking copy of the RMST Exhibition, and was built by Zaller and the Defendants using the confidential, proprietary RMST property provided by the Company for the staging of the Singapore Exhibition.

30.     Zaller's fraudulent representations enabled him to acquire key tangible personal property and intellectual property of the Company for his benefit and for the benefit of the Defendants. Zaller and the Defendants knowingly and intentionally copied, or caused to be copied, significant portions of the RMST Exhibition, including but not limited to design elements, room re-creations, signature works, photographs, and narratives, in order to create and operate a competing exhibition, already presented to the public at the Venetian Macau, under the name "Titanic ... The Exhibition," which is intentionally designed and staged to be substantially similar to the novel RMST Exhibition.

31.     Zaller and the Defendants actually used RMST's confidential, proprietary digital files they received in conjunction with the Singapore Exhibition to create the Zaller/Kingsmen Exhibition. Before the filing of this Complaint, the Company obtained a draft of the architectural floor plan (also referred to as the CAD files) of the Zaller/Kingsmen Exhibition (the "Defendants' Design File"). Comparisons of a floor plan for the RMST Exhibition with the Defendants' Design File confirm that the Defendants not only copied, but actually utilized Premier's architectural CAD files to create Defendants' Design File and to build the Zaller/Kingsmen Exhibition.

32.     In laying out their exhibition, the Defendants cut and pasted most of the RMST Exhibition floor plan into their own. The Defendants crafted nearly all of the design and production work for their exhibition utilizing the Company's architectural floor plan as its blueprint. The Defendants utilized the information they obtained while working as a contractor on the RMST Exhibition in Singapore to further duplicate the design components and look and feel of the RMST Exhibition into the Zaller/Kingsmen Exhibition. The actual preparation of the Defendants' Design File required countless hours of digital copying by employees of Kingsmen utilizing the Company's architectural design file from the RMST Exhibition as the source materials.

33.     The Company's architectural design files for the RMST Exhibition included the following copyright stamp protecting the Company's intellectual property: "© 2010 Premier Exhibitions, Inc. . .. All rights reserved."  When cutting and pasting this architectural design file into the Defendants' Design File for the Zaller/Kingsmen Exhibition, the Defendants simply deleted the Premier stamp, replaced it with the name, "Kingsmen Exhibits Pte, Ltd.," and inserted their own copyright protective stamp which states: "© COPYRIGHT THIS DRAWING/ DESIGN IS COPYRIGHT RESERVED." The Defendants added further protective language to their cut-and-pasted architectural design including, "[n]o part of this work may be reproduced or used in any form or by any means without written permission" and "[a]ll prints, specifications and their copyright are the property of Kingsmen and shall be returned at the completion of the work."

34.     The Defendants deliberately and without authorization used signature works owned, authored and created by Premier, and easily identifiable by Premier, in the design and ground plan of the Zaller/Kingsmen Exhibition.  In the Defendant's Design File, the Defendants used Premier's numbering and artifact scheme found in its CAD drawings, even though the Defendants did not have artifacts to correspond with the numbering and artifact scheme they duplicated; they also used nearly identical room and setting designs and layouts, text and graphic panels, photographs, gobos, lighting schemes, and color schemes. They used graphics which employ the same font and lettering style as used in the RMST Exhibition, and utilize a confusingly similar exhibition name, "Titanic . . .the Exhibition."

35.     Purportedly in conjunction with the preparation of the Singapore Exhibition, on October 28, 2011, Zaller verbally requested and obtained from Premier very specific information and materials owned and/or in the possession of Premier, such as historical quotes, photographs, historical data, and underwater footage. The Defendants then utilized these very same materials and information in the design and production of the Zaller/Kingsmen Exhibition.   In fact, Zaller and the Defendants actually incorporated certain underwater videos owned by Premier and provided to Zaller and the Defendants in conjunction with the Singapore exhibition in a marketing video used to promote the Zaller/Kingsmen Exhibition in Macau. In that same video, Zaller and the Defendants also utilized still photographs of the RMST Exhibition in Singapore to promote the Zaller/Kingsmen Exhibition, as if such photographs were taken from the Zaller/Kingsmen Exhibition.

- 11 -

36.     Without the Company's authorization, the Defendants pirated and converted the Company's tangible personal property and intellectual property for their own commercial use in the Zaller/Kingsmen Exhibition.  It took Premier decades and millions of dollars to assimilate historical information, create stories, draft text, take photographs and video all necessary to design and build the current RMST Exhibition. Unlawfully utilizing Premier's tangible personal property and intellectual property, the Defendants were able to build the Zaller/Kingsmen Exhibition in just a few months. Without their misappropriation and conversion of the Company's intellectual property, the Defendants would never have been able to design, construct and stage the Zaller/Kingsmen Exhibition, let alone for a presentation in Macau in October, 2012.

37.     The Defendants have also created or caused to be created certain publications and advertisements for the Zaller/Kingsmen Exhibition that contain photographs and/or videos that are the property of RMST and/or Premier, some of which depict the Company's items, not those in the Zaller/Kingsmen Exhibition.

**Defendants' Transacting Business and Tortious Conduct in Florida**

38.     In the RMST Exhibition, the Company utilizes a cold-to-the-touch mechanical device which simulates an iceberg. This iceberg, and the room in which the iceberg is housed in the Company's Titanic exhibitions, constitute signature works of the RMST Exhibition. Along with virtually every other key component of the RMST Exhibition, the Defendants and Zaller sought to duplicate the iceberg for their exhibition.

- 12 -

39.     Lacking the technological know-how to design and manufacture the iceberg, the Defendants solicited the expertise of Attractions and Entertainment Solutions, Inc. ("AES"), a design company located at 11328 Business Park Boulevard in Jacksonville, Florida. Following the initial solicitation by the Defendants to the President of AES at his office in Jacksonville, Duval County, Florida, the Defendants then commenced formal negotiations with AES in Jacksonville, to retain the services of AES in the design and manufacture of the iceberg.

40.     The contract negotiations took place by phone and electronic mail between Mr. Oldham and his representatives at AES in Jacksonville, Florida, and representatives of the Defendants in Singapore. Following these negotiations, the Defendants and AES entered into a written agreement executed at AES' offices in Jacksonville, Florida, under which the Defendants would work with AES to design and manufacture an iceberg to be used in the Zaller/Kingsmen Exhibition.

41.     In order to design and manufacture the iceberg, employees of the Defendants sent to AES in Jacksonville, Florida a copy of the Defendant's Design File, knowing that the Defendant's Design File contained the Company's proprietary and confidential intellectual property, certain of which Defendants had to provide AES in Jacksonville, Florida, in order for AES to design and construct the iceberg for the Zaller/Kingsmen Exhibition.

42.     Along with the Defendants, AES representatives utilized the Defendant's Design File to design, produce, manufacture and fabricate the iceberg for the Zaller/Kingsmen Exhibition. The entire process to design, produce, manufacture and fabricate the iceberg took place at the AES offices in Jacksonville, Florida.

43.     The iceberg, which AES and the Defendants designed and which AES built in Jacksonville, Florida, represents an absolute copy of the iceberg utilized by the Company in the RMST Exhibition in Singapore and numerous other Titanic exhibitions presented by the Company around the world. It is a key component of the Zaller/Kingsmen Exhibition and was able to be built only because Defendants provided AES the Company's intellectual property that had been fraudulently obtained by Zaller and converted and reproduced by the Defendants.

44.     Payments for the services of AES were made by the Defendants to AES at its offices in Jacksonville, Florida. The iceberg created by AES and the Defendants was shipped from Jacksonville, Florida to the Venetian Macau for its inclusion in the first presentation of the Zaller/Kingsmen Exhibition.

## Legal Proceedings

45.     Counsel for the Company sent a written notice to Zaller on or about February 6, 2013 (the "Cease and Desist Letter"). The Cease and Desist Letter advised Zaller that the Zaller/Kingsmen Exhibition contains misappropriated Company intellectual property, violates the Company's intellectual property rights and constitutes unfair competition. The Cease and Desist Letter made written demand that the Zaller/Kingsmen Exhibition immediately cease and desist its operation. On February 26, 2013, the Company

- 14 -

filed suit against Mr. Zaller and his companies in the United States District Court for the Northern District of Georgia, where Mr. Zaller resides and where his companies maintain their principal place of business.

46.      Counsel for the Company sent written notice to the Defendants on or about March 6, 2013 (the "Notice Letter"). The Notice Letter advised Defendants of the lawsuit filed against Zaller, and that Defendants had knowingly, intentionally and voluntarily misappropriated, converted and utilized the Company's confidential and proprietary files in the design and fabrication of the Zaller/Kingsmen Exhibition, which files and information Defendants obtained from Mr. Zaller and the Company while closely working with Company representatives as an agent of the promoter in the production of the RMST Exhibition in Singapore, and then subsequently as a partner of Zaller in the Zaller/Kingsmen Exhibition. The Notice Letter and subsequent correspondence sent to the Defendants informed Defendants in great detail how the Zaller/Kingsmen Exhibition contains misappropriated Company intellectual property, violates the Company's intellectual property rights and constitutes unfair competition.

47.      Despite these notices, the Zaller/Kingsmen Exhibition continued to operate through March 31, 2013, generating profits, goodwill and other benefits for, and causing confusion in the public due to the intentional copying by, the Defendants of the RMST Exhibition. As a partner of Zaller in the Zaller/Kingsmen Exhibition, the Defendants receive a share of the revenues from the exploitation of that exhibition.

48.     Moreover, despite the cease and desist letters, Zaller and the Defendants are marketing the Zaller/Kingsmen Exhibition in other cities across the world, thereby depriving the Company of opportunities to stage the RMST Exhibition and/or affecting the revenues the Company will receive for the RMST Exhibition, which activities by Defendants are adversely affecting United States commerce.

49.     Following the Notice Letter, the parties and their counsel exchanged numerous letters and emails and participated in telephone conversations related to the Company's claims and the Defendants' actions. The letters from the Company's counsel explained in detail the nature of the Company's claims, including the claims under United States federal law, as well as the type of relief afforded the Company under applicable laws. The Company engaged in these communications in an effort to facilitate a quick, fair settlement between the parties. During the period of their discussions, the parties participated in a video conference at which the Company presented some of the specific evidence it had already developed with respect to the Defendants' and Zaller's unlawful actions.

50.     On or about April 16, counsel for the Company extended an extensive pre-litigation settlement offer to the Defendants, and advised the Defendants that the offer was valid only until April 23, 2013.  The Company advised the Defendants that the Company would file its lawsuit at that time if the parties had not reached a settlement by then.

51.     Following this communication, Mr. Anthony Chong, Managing Director of Kingsmen Exhibits, Pte. Ltd., spoke with Mr. Samuel Weiser, the Company's President and Chief Executive Officer, on the telephone. Mr. Chong told Mr. Weiser that the he

needed a few extra days to consider the offer with Defendants' Board of Directors, and asked Mr. Weiser for verbal assurances that the Company would delay filing its lawsuit until the Defendants had sufficient time to fully consider this last offer. Specifically, Mr. Chong asked Mr. Weiser for his verbal promise that the Company would not file its lawsuit before April 23, 2013. In a show of good faith, on behalf of the Company, Mr. Weiser gave Mr. Chong that verbal promise. Upon receiving this assurance, Mr. Chong then asked Mr. Weiser to have the Company's counsel send him a formal letter confirming its commitment, on the Company's behalf, to refrain from filing suit in the United States until at least April 23, 2013. Mr. Chong also requested on April 18, 2013 that the Company's counsel provide Defendants a draft of a proposed settlement agreement, "so that we can consider your clients' settlement proposal in totality." In a further showing of good faith, counsel for the Company provided that letter and the draft Full Settlement and Release agreement to Mr. Chong on April 18, 2013. Mr. Chong never responded to the Company's offer.

52.    Four days later, on April 22, 2013, the last day of the Company's voluntarily grace period, Defendant Kingsmen Exhibits, Pte, Ltd. filed an action against the Company in the High Court of the Republic of Singapore. In that action, Kingsmen Exhibits, Pte. Ltd. seeks a declaratory judgment that the Defendants have not violated the Company's "copyright and trade mark in respect of the design, production and staging of the Macao Exhibition." Kingsmen Exhibits Pte, Ltd. seeks relief under two Singapore statutes referenced as sections 200(1)(a) and 200(1)(b) of the Copyright Act and section

- 17 -

35(2)(a) of the Trade Marks Act.  A copy of Kingsmen Exhibits Pte. Ltd. suit is attached hereto as Exhibit A.

53.     The Company received informal notice of the Kingsmen lawsuit on the afternoon of April 26, 2013. The Company has not yet been properly served with that suit.

## COUNT I -- CONVERSION

54.     Paragraphs 1-53 are adopted and re-alleged as if fully restated herein.

55.     The Company's digital files and information, comprised of tangible personal property and intellectual property relating to the RMST Exhibition, consist of materials and represent novel ideas that were sufficiently concrete as to be usable, and from which additional tangible personal property can be created.  The property provided to the Defendants contains the keys and map to the entire RMST Exhibition, which was painstakingly developed by the Company over many years, from the original idea and concept to the final room-to-room layout with content.  For example, the tangible personal property and intellectual property include the RMST Exhibition's unique floor plan and layout, artifact arrangements, lighting placement, customer interactive experiences (including the passenger tickets provided to each customer upon entering the exhibition, and the cold to the touch iceberg exhibit), print text narrative contents and locations, room re-creations (including the choice of Titanic rooms to re-create and display, each room's details, including architecture, color scheme, placement, and decoration, photograph opportunities, etc.), photograph content and locations, and much more.  As such, the tangible personal property and intellectual property were sufficiently concrete in development to be usable.

- 18 -

56.     The Company's tangible personal property and intellectual property relating to its RMST Exhibition were provided to Zaller and the Defendants in confidence, in their role as agents for the promoter of the Singapore Exhibition, and only for the specific purposes of building and displaying the RMST Exhibition in Singapore, pursuant to the Singapore Exhibition Agreement.

57.     Zaller, while acting as the designated agent for the promoter, knowingly and intentionally falsely represented that the Company's intellectual property and digital files were necessary for the display of the RMST Exhibition in Singapore.

58.     Zaller and the Defendants then wrongfully adopted, used and converted the Company's tangible personal property and intellectual property and materials for their commercial use in the Zaller/Kingsmen Exhibition.

59.     The Zaller/Kingsmen Exhibition is displaying materials, including tangible personal property and using intellectual property, belonging to the Company which were improperly acquired by willful misrepresentations and deception during the involvement of the Defendants and Zaller with the RMST Singapore Exhibition.  The Zaller/Kingsmen Exhibition utilizes and is displaying tangible personal property Zaller and the Defendants converted from Premier, including room re-creations, photographs, narratives, poster boards and writings.

60.     As a direct and proximate cause of the wrongful conversion of its tangible personal property and intellectual property, the Company has suffered, and will suffer, damages in the United States in an amount to be determined by a jury.

61. The Company also intends to seek punitive damages against the Defendants for their intentional conversion, in an amount to be determined by a jury.

## COUNT II – UNJUST ENRICHMENT

62. Paragraphs 1-53 are adopted and re-alleged as if fully restated herein.

63. The Company's tangible personal property and novel intellectual property and digital files relating to its RMST Exhibition were provided to Zaller and the Defendants in confidence, as agents for the promoter of the Singapore Exhibition, only for the limited use of building and displaying the RMST Exhibition in Singapore pursuant to the Singapore Exhibition Agreement.

64. The promoter paid the Company a substantial sum for the right to license the Company's tangible personal property and novel intellectual property and digital files in Singapore pursuant to the Singapore Exhibition Agreement. The Company reasonably expects payment for any use of its property or digital files. A promise to pay can therefore be reasonably implied to any other use of the property and digital files, outside of those contemplated by the Singapore Exhibition Agreement.

65. The Zaller/Kingsmen Exhibition displayed materials and used intellectual property belonging to the Company. Defendants' use of the Company's intellectual property and materials is accompanied by an implied promise to pay the Company a reasonable fee for this unauthorized use. Zaller and the Defendants have not paid the Company any amount for the usage of its tangible personal property, intellectual property and/or digital files.

66. Through the Zaller/Kingsmen Exhibition, the Defendants have knowingly and wrongfully benefited, in an amount to be determined at trial, from the use and display of the Company's tangible personal property, intellectual property and/or digital files, without paying the Company any amount for their usage.

67. It would be inequitable and unjust for the Defendants to enjoy and retain the benefits of the use of the Company's tangible personal property, intellectual property and/or digital files without paying the Company for their use.

68. The company is entitled to payment, in an amount to be determined by a jury, for the losses it has sustained, and will sustain from Defendants' unauthorized use of its property.

## COUNT III -- TRADE DRESS/LANHAM ACT

69. Paragraphs 1-53 are adopted and re-alleged as if fully restated herein.

70. This cause of action for trade dress infringement arises under 15 U.S.C. § 1125(a).

71. The Company displays the RMST Exhibition in association with certain trade dress represented by the RMST Exhibition in commerce throughout the world, including in the United States ("RMST Trade Dress"). This RMST Trade Dress includes the total image and overall appearance of the RMST Exhibition as reflected in such features as size, shape, color or color combinations, lighting, design, texture, graphics, photographs, and narratives. The RMST Trade Dress is valid and protectable.

72. The RMST Trade Dress is inherently distinctive.

73. The total image and overall appearance of the RMST Exhibition has acquired distinctiveness in the minds of consumers and potential consumers, and the RMST Exhibition, which has been staged in the United States and all over the world, has been extremely successful and received extensive media coverage and recognition, including last year with the 100th anniversary of the Titanic voyage.

74. The RMST Trade Dress is non-functional.

75. The Defendants produced a similar or identical good or service to the RMST Trade Dress in the United States. The Defendants have been marketing a similar or identical good or service to the RMST Trade Dress, the Zaller/Kingsmen Exhibition, in the United States and throughout the world. The Zaller/Kingsmen Exhibition contains such features as size, shape, color or color combinations, lighting, design, texture, graphics, photographs, and sales and marketing techniques which are identical or confusingly similar to those of the RMST Trade Dress. For example, the Zaller/Kingsmen Exhibition's overall room choice placement is substantially similar to that of the RMST Exhibition, as well as the placement and design of re-created items (e.g., details of the first class hallway) within each room; the Zaller/Kingsmen Exhibition places showcase vitrines containing artifacts in similar locations in each room as the RMST Exhibition; the Zaller/Kingsmen Exhibition utilizes the same color schemes as the RMST Exhibition at the entry of the exhibition and throughout the rooms of the exhibition; the Zaller/Kingsmen Exhibition uses the same or substantially similar narratives in the text panels; the Zaller/Kingsmen Exhibition's graphics employ the same font and lettering style in its name as used in the name of the RMST Exhibition, and utilize a confusing similar exhibition name, "Titanic . . .the

Exhibition"; the Zaller/Kingsmen Exhibition utilizes the similar unique light patterns projected by "gobos" on the floors from the ceilings; the Zaller/Kingsmen Exhibition uses signature fiber optic lighting from the RMST Exhibition in the exact same exhibition locations and in the same manner; the Zaller/Kingsmen Exhibition built and uses the same "iceberg" used in the RMST Exhibition; the Zaller/Kingsmen Exhibition uses the same "star drop curtain" utilizing hundreds of fiber optic lights to mimic the starry night on the observation deck as used in the RMST Exhibition; the Zaller/Kingsmen Exhibition copies historical quotes and photographs utilized by the RMST Exhibition; the Zaller/Kingsmen Exhibition copies the overall secondary experience of the consumers as created by the RMST Exhibition, including mimicking tactile interactions and the consumer's identification with particular Titanic passengers through use of reproduction passage tickets; the Zaller/Kingsmen Exhibition recklessly uses signature works owned, authored and created by Premier, and easily identifiable by Premier, in the design and ground plan of the Zaller/Kingsmen Exhibition, including the Company's numbering and artifact scheme found in its CAD drawings; the Zaller/Kingsmen Exhibition uses strikingly similar rooms and room layouts, including but not limited to the iceberg, the iceberg room, the boiler room, the ship "entrance", the Grand Staircase, the First Class cabin, the First Class Hallway, the Observation Deck, the memorial wall, the "ocean-bottom" room, and the departure room; and much more.

76.     Such marketing and staging is likely to cause confusion in the minds of the purchasing public as to the origin, source, sponsorship, approval or association with respect to the various features and overall appearance of the exhibition.

77.     The Defendants have no trademark or trade dress rights to the RMST Exhibitions or the Zaller/Kingsmen Exhibition.

78.     The Defendants' use of such features in the Zaller/Kingsmen Exhibition for their own commercial gain constitutes infringement of the RMST Trade Dress under 15 U.S.C. § 1125(a). The Company has not provided the Defendants with any license or permission to use any of the Company's intellectual property including, without limitation, the RMST Trade Dress.

79.     The Defendants' acts are willful, intentional, knowing and undertaken for their financial benefit and to harm the competitive position of the Company.

80.     The Defendants' infringing actions have had a substantial effect on United States commerce, including that certain of their actions occurred in the stream of United States commerce and have been materially supported by Defendants' activities in the United States.

81.     As a direct and proximate cause of Defendants' willful infringement, the Company has suffered, and will suffer, damages in an amount to be determined.

### COUNT IV -- MISAPPROPRIATION OF TRADE SECRETS

82.     Paragraphs 1-53 are adopted and re-alleged as if fully restated herein.

83.     The Company owns certain intellectual property and digital files that constitute trade secrets under Florida Code Section 688.001, the Florida Uniform Trade Secrets Act. The Company took extensive efforts to protect its trade secrets and proprietary materials, including as to Zaller and the Defendants. The Singapore Exhibition Agreement specifically provides that the promoter undertakes and warrants to protect the

- 24 -

Company's intellectual property, and the Company took its own actions to secure and protect its intellectual property and trade secrets from public disclosure.

84.     The Company has a legally protectable interest in its trade secrets. Specifically, the Company's above-described intellectual property, digital files and tangible personal property include technical and non-technical data, compilations, drawings and techniques, which are not commonly known or available to the public, and which are not readily ascertainable by proper means, and from which the Company derives great economic value and benefit, and which are the subject of extensive efforts by the Company to keep secret.

85.     The Defendants' acquisition of the Company's intellectual property, digital files, and tangible property for their use in the competing Zaller/Kingsmen Exhibition was by improper means, including fraud, deceit, misrepresentations, and conversion, and constitutes misappropriation of the Company's trade secrets under the Florida Uniform Trade Secrets Act.

86.     The Defendants and/or their partners knew the Company considered the above-described intellectual property, digital files and tangible property to be trade secrets, knew the Company took extensive efforts to maintain their secrecy, and nonetheless intentionally and deliberately used improper means to acquire these trade secrets and then used them without Company permission and authorization for their own economic benefit.

87.     As a result of the Defendants' misappropriation of the Company's trade secrets, the Company has suffered, and will suffer, damages and the United States in an amount to be determined by a jury.

88. The Defendants' willful and intentional misappropriation of the Company's trade secrets was specifically done to injure the Company and/or for the Defendants' commercial benefit and the presentation of this evidence will entitle the Company to punitive damages in an amount to be determined by the jury, as well as an award of the Company's attorneys' fees.

## COUNT V – CIVIL CONSPIRACY

89. Paragraphs 1-53 are adopted and realleged as if fully restated herein.

90. Zaller and the Defendants are parties to a civil conspiracy. They conspired to misappropriate, reproduce and convert the Company's intellectual property and then used the Company's intellectual property to design, create, stage and market the Zaller/Kingsmen Exhibition, all to the detriment and damage of Plaintiffs.

91. Zaller and the Defendants committed at least one overt act in furtherance of the conspiracy. Specifically, Zaller and Defendants acquired the Company's intellectual property, including digital files and tangible property, through improper means, including fraud, deceit, misrepresentations and conversion. Such actions by Zaller and the Defendants are unlawful.

92. Defendants then utilized the Company's intellectual property to create the Zaller/Kingsmen Exhibition, including by providing the Company's intellectual property to a vendor in Jacksonville, Florida for design and creation of the cold-to-touch iceberg.

- 26 -

93. Defendants and Zaller then staged the Zaller/Kingsmen Exhibition in Macau, which Exhibition utilized the Company's intellectual property, thereby depriving the Company of the opportunity to present its RMST Exhibition in Macau and causing the Company economic damages.

94. Zaller and the Defendants have continued to market the Zaller/Kingsmen Exhibition to other promoters across the world, thereby further damaging Plaintiffs by affecting their ability to stage the RMST Exhibition, causing Plaintiffs further economic losses and damages.

95. The Defendants' willful and intentional conspiratorial actions and were specifically done to injure the Company and/or for the Defendants' commercial benefit, and did injure the Company, and the proof of these actions will entitle the Company to compensatory and punitive damages in amounts to be determined by the jury, as well as an award of the Company's attorneys' fees.

**JURY TRIAL DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

**WHEREFORE**, Plaintiffs Premier Exhibitions, Inc. and RMS Titanic, Inc. pray that this Court enter judgment against the Defendants as follows:

a. That they be ordered to pay the Company: (i) all damages, as determined by a jury, for their conversion of the Company's key tangible personal property and intellectual property; (ii) all benefits unjustly received and retained by their use of the Company's key tangible personal property and intellectual property without paying for the use thereof; (iii) all damages, as determined by a jury, for their misappropriation of the

- 27 -

Company's trade secrets; (iv) all damages, as determined by a jury, and as under the Lanham Act, for their infringement of the RMST Trade Dress; and for civil conspiracy; (v) all such punitive, statutory, attorneys' fees, and other damages and relief as this Court deems appropriate; (vi) preliminary and permanent injunctive relief against Defendants, and those in active concert or participation with them, from any further unauthorized use of the Company's tangible personal property and intellectual property, including its trade secrets, and from any further acts of infringement of RMST Trade Dress; (vii) an award of interest, including pre- and post-judgment interest, and the costs of bringing this action, together with the Company's attorneys' fees; and (viii) such other and further relief as the Court deems proper.

Dated:  April 28, 2013                   MCGUIREWOODS LLP


By: _____
    R. Eric Bilik
    Florida Bar No. 0987840
    ebilik@mcguirewoods.com
    Rory J. Diamond
    Florida Bar No. 101666
    rdiamond@mcguirewoods.com
    50 North Laura Street, Suite 3300
    Jacksonville, FL 32202
    Telephone:  (904) 798-2685
    Facsimile:  (904) 360-6304


    *Attorneys and Trial Counsel for Plaintiffs*
    *RMS Titanic, Inc. and Premier Exhibitions,*
    *Inc.*

47571753_1.DOCX

- 28 -